UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                                    :
JANE DOE,                                           :
                                                    :
                            Plaintiff,              :
                                                    :          26-CV-01734 (JAV)
              -v-                                   :
                                                    :          <u>OPINION AND ORDER</u>
ICAHN SCHOOL OF MEDICINE AT MOUNT                   :
SINAI,                                              :
                                                    :
                            Defendant.              :
                                                    :
-------------------------------------------------------------------X

JEANNETTE A. VARGAS, United States District Judge:

Plaintiff Jane Doe ("Doe"), a medical student currently enrolled in the Doctor of Medicine ("MD") program at the Icahn School of Medicine at Mount Sinai ("ISMMS"), brings this action against Defendant ISMMS, alleging discrimination based on her disability in violation of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law § 296. ECF No. 1 ("Complaint" or "Compl."), ¶¶ 8, 50-99. Presently before the Court is Doe's motion for a preliminary injunction. ECF No. 7. For the following reasons, Doe's motion for a preliminary injunction is **DENIED**.

BACKGROUND

## A.     Findings of Fact

On June 10, 2026, the Court held an evidentiary hearing on Doe's motion for a preliminary injunction. At that hearing, the Court received direct testimony in

the form of declarations from Doe, Dr. Rainier Soriano (the ISMMS Senior Associate Dean for Curricular Affairs and Medical Education), and Christine Low (the ISMMS Director of the Office of Disability Services).  ECF Nos. 17 ("Low Decl."), 20, 38, 39.  Doe's counsel also cross-examined Dr. Soriano and Ms. Low.  The following findings of fact are therefore drawn from the testimony received at the June 10 evidentiary hearing as well as the exhibits filed on the docket and received into evidence during the hearing on the motion for a preliminary injunction.

### 1.    ISMMS's MD Program

ISMMS's MD program requires students who matriculated in 2024 and thereafter to complete the ASCEND curriculum in accordance with ASCEND policies.  ECF No. 16 ("Fallar Decl."), ¶¶ 3-4; ECF No. 16-1 ("ASCEND Policies") at 1, 27-28.  These policies establish uniform standards for academic performance, remediation, and progression, and they apply to all students.  *See* Fallar Decl., ¶¶ 1, 3.

The ASCEND curriculum is structured in three phases:  Phase 1 (Preclerkship Phase), Phase 2 (Clerkship Phase), and Phase 3 (Integration and Transitions Phase).  ASCEND Policies at 31-33.  Phase 1 lasts three semesters and requires, *inter alia*, completing multiple modules, including Anatomy, Neuroscience, Hematology, Cardiology, Renal, and others.  *Id.* at 31-32.  Module grades derive from multiple components, such as, for example, Customized Assessment Services ("CAS") exams, quizzes, and small group work.  *See, e.g.*, ECF No. 16-7.

To advance to Phase 2, students must successfully complete all required

2

Phase 1 modules, either by passing the module or by successful remediation.  Fallar Decl., ¶ 4.  If a student's module grade is below the passing cutoff prior to final grade determination, they may retake one assessment to improve their grade.  ASCEND Policies at 38.  Students are permitted to retake one assessment in two different modules during Phase 1.  Fallar Decl., ¶ 4.  Accordingly, students may only exercise this option twice over the entirety of Phase 1.  Once they have exhausted those two retakes, students who fail a module must complete a structured remediation aligned with the module's learning objectives.  *Id.*

Students who do not successfully complete remediation are referred to the Promotions Committee for further review.  *Id.*  Ultimately, students who do not meet the criteria for progression may be placed on Academic Probation, which requires degree progress within a specific timeframe.  ASCEND Policies at 20.  If they continue to fail to meet the requirements of the MD program, students may be suspended or dismissed.  *See id.* at 20-21.

Additionally, ISMMS has an Office of Disability Services ("DS"), which registers students and makes eligibility determinations regarding academic and housing accommodations, develops and implements accommodations, and reviews requests for supplemental or modified accommodations.  Low Decl., ¶ 1.  DS provides a range of accommodations and services to registered students, including testing accommodations, classroom accommodations, communication access, campus access accommodations, and referrals to learning specialists.  *Id.*, ¶ 3.

To receive accommodations, a student must submit an Application for

Accommodations and Services, provide documentation of their disability, and meet with DS staff. *Id.*, ¶ 4. DS reviews the submission to determine eligibility for accommodations and to identify accommodations that are reasonable and do not fundamentally alter academic standards or program requirements. *Id.* Upon approval, DS issues an accommodation plan. *Id.*, ¶ 5. If a student later seeks to modify or add accommodations, DS requires the student to notify them of their desired accommodation request and, where appropriate, to provide updated documentation reflecting changes in diagnosis, functional limitations, or clinical needs. *Id.*, ¶ 6. DS then evaluates whether the requested accommodation is reasonable, supported, and consistent with academic standards. *Id.*

**2.    Doe's Progress in ISMMS's MD Program**

Doe is a medical student who enrolled in ISMMS's MD program in the fall of 2024. Fallar Decl., ¶ 5. She has been diagnosed with Attention Deficit Hyperactivity Disorder – Combined Type ("ADHD"), and has a documented history of temporal lobe epilepsy and migraines. ECF No. 7-1 at 1, 5. Although she was seizure-free for five years as of December 2023, *id.* at 1, her seizure disorder reactivated when she started medical school, ECF No. 24 ("Supp. Doe Decl."), ¶ 15. Due to her ADHD, Doe has difficulty with organization, time management, and sustaining attention on tasks she finds less interesting, ECF No. 7-1 at 2, problems which grew during her time in medical school, *see* Supp. Doe Decl., ¶ 15.

Accordingly, Doe applied for and received multiple accommodations for her ADHD and focal epilepsy. Low Decl., ¶¶ 7-15. These accommodations included

note-taking assistance; time-and-a-half on written portions of exams and quizzes; reduced-distraction testing environment; stop-the-clock breaks on shelf, Direct Observation ("DO"), Objective Structured Clinical Examinations ("OSCE"), and CAS exams, with a maximum additional fifteen minutes of standard test time; limited assessment rescheduling; and receipt of a medical single bedroom at the Aron Hall rate. *Id.*

Nonetheless, Doe experienced academic difficulties during Phase 1. ECF No. 7-8 ("Nestler Ltr.") at 2. During the Fall 2024 semester, she initially received a failing score in Anatomy but she used one of her retake opportunities and achieved a passing score. Fallar Decl., ¶ 5. During the Spring 2025 semester, Doe also earned failing scores in Neuroscience, Hematology, and Cardiology. *Id.*, ¶ 6. She used her second retake opportunity in Neuroscience and achieved a passing score. *Id.*

Having exhausted her two retake opportunities, Doe was required to engage in the remediation process for Hematology and Cardiology. *Id.* Concerning Cardiology, Doe elected to defer taking the remediation exam until later in the academic year, rather than completing remediation during the summer term. *Id.*, ¶ 7. Concerning Hematology, Doe took the remediation exam and on July 25, 2025, she was notified that she had received a failing score of 64%. *Id.*, ¶ 8.

Doe appealed her grade on the Hematology remediation exam to the Grade Appeal Committee, arguing that, contrary to ASCEND policies, she had been inadequately informed of the criteria to pass remediation. *See id.*, ¶¶ 8-9; ECF No.

16-3 at 3.  Specifically, she argued that ASCEND policies required the Module Director to provide her with a remediation plan that clearly defined goals, assessments, and passing criteria, but she was never provided such a plan in writing.  *See* Fallar Decl., ¶¶ 8-9; ECF No. 16-1 at 54; ECF No. 16-3 at 3.  While the passing standard of 65% had consistently applied since the start of the academic year to Phase 1 module grades and CAS exams, the Grade Appeal Committee nonetheless agreed that remediation expectations were not set out in a formal written plan and that the absence of such a plan may have created avoidable ambiguity.  ECF No. 16-4 at 1.  Accordingly, the Grade Appeal Committee granted Doe's appeal in part and authorized one additional remediation exam conducted under a formal written plan.  *Id.*

Doe's academic difficulties continued during the Fall 2025 semester.  Doe took the Hematology remediation exam again and once more failed the exam with a score of 64%.  *See* Fallar Decl., ¶ 11; ECF No. 16-6 at 1-2.  As a result, her academic record was referred to the Promotions Committee for review.  Fallar Decl., ¶ 11.  Doe also failed the Renal module exam.  *Id.*, ¶ 12.  Separately, in September 2025, Doe scheduled her Cardiology remediation exam for December 5, 2025.  *Id.*, ¶ 10; ECF No. 16-5 at 2.  But Doe repeatedly requested to postpone the Cardiology remediation exam since she was not ready to take it.  *See* Fallar Decl., ¶¶ 14, 19; ECF No. 16-9 at 1-2; ECF No. 16-14 at 1-2.  Her requests were approved, and her Cardiology remediation exam was ultimately postponed until January 2026.  Fallar Decl., ¶¶ 14, 19; ECF No. 16-9 at 1-2; ECF No. 16-14 at 1-2.

On December 15, 2025, the Promotions Committee met with Doe to discuss her academic timeline.  ECF No. 15 ("Arden Decl."), ¶ 6; ECF No. 15-2 at 2.  At that time, she had outstanding failures in Hematology, Cardiology, and Renal modules which needed to be remediated.  ECF No. 15-2 at 2.  Doe appeared at the meeting and made a presentation regarding her academic progress and concerns.  Arden Decl., ¶ 6.

On December 22, 2025, the Promotions Committee sent a letter to Doe informing her that she was being placed on Academic Probation due to her consistent academic challenges.  *Id.*, ¶ 7.  The letter instructed Doe, "To progress to Phase 2, you must successfully pass all remediations and complete all Phase 1 requirements by February 9, 2026," and required Doe to appear before the Promotions Committee on January 12, 2026, to provide an update on her academic progress.  ECF No. 15-2 at 2-3 (emphasis omitted).

On December 23, 2025, Doe appealed the Promotions Committee's Academic Probation decision to Dean Eric Nestler ("Dean Nestler").  Arden Decl., ¶ 8.  In that appeal, Doe requested adjustments to her Hematology remediation plan.  ECF No. 15-3 at 2-3.  A few weeks later, Dean Nestler sent Doe a letter with his decision that upheld the Promotions Committee's December 22, 2025 Academic Probation determination.  Arden Decl., ¶ 11.  In that letter, Dean Nestler also upheld the Hematology remediation plan in place for Doe.  ECF No. 15-6 at 2.

On January 6, 2026, Doe emailed DS a "formal request to refine [her] remediation plan for the Hematology block."  ECF No. 17-9 at 1.  In that email, Doe

requested a "[t]argeted [a]ssessment" consisting of "[a] 30-item focused assessment targeting specific areas of deficiency rather than a global re-test," "[t]argeted [o]utlined [f]eedback" consisting of "[d]etailed feedback within the 'three buckets,' specifically identifying sub-topics and providing a structured outline with lecture references," and "[i]ndividualized [c]ollaborative [t]utoring" consisting of "[i]ndividualized tutoring focused on gap identification and collaborative problem-solving before non-graded assessments." *Id.* at 1-2.  At the June 10, 2026 evidentiary hearing, Doe's counsel clarified that Doe's request effectively asked to reduce the remediation examination from 50 questions to 30 questions, to have the course director prepare a detailed outline of all course materials covered (broken down by sub-topic) that cross-referenced the lectures, and to receive one-on-one, individualized tutoring from the course director.  Hr'g Tr. at 56:11–58:1.

Two weeks after Doe emailed DS her accommodation requests relating to Hematology, DS denied her requests.  Low Decl., ¶ 21.  DS determined that the requested modifications were not necessary to address a disability-related access barrier because Plaintiff already had equal access to the instructional materials, preparatory resources, and assessment opportunities provided to all students.  *Id.* DS also determined that granting such structural changes would require modification of essential academic requirements and therefore constitute a fundamental alteration of the M.D. program.  *Id.*

On January 12, 2026, the Promotions Committee met again with Doe.  ECF No. 15-4 at 2.  She updated the Promotions Committee about her successful passage

of the Renal remediation exam.  *Id.* at 3.  On January 14, 2026, the Promotions Committee sent a written follow-up letter to Doe confirming that she remained on Academic Probation and requiring her to appear before the Promotions Committee on February 9, 2026, to provide a further update on her academic progress.  ECF No. 15-5 at 2.

In January 2026, Doe took both Hematology and Cardiology remediation exams.  *See* Fallar Decl., ¶¶ 21-23.  Although she passed her Hematology remediation exam, she failed her Cardiology remediation exam with a 58%.  *Id.*, ¶¶ 22-23.

On February 9, 2026, Doe did not appear for the scheduled Promotions Committee meeting.  Arden Decl., ¶ 13.  At the meeting, the Promotions Committee reviewed the written statement that Doe had previously submitted, as well as her academic record and remediation outcomes.  *Id.*  On February 12, 2026, the Promotions Committee sent a letter to Doe informing her that, because she had not met the requirements for progression to Phase 2 due to her failure of the Cardiology remediation, she must repeat Phase 1, and so she would be placed on an administrative leave of absence until the start of Phase 1 in August 2026 and would remain on Academic Probation during that period.  *Id.*, ¶ 14; ECF No. 15-8 at 2.

That same day, Doe appealed the Promotions Committee's February 12, 2026 decision to Dean Nestler.  Arden Decl., ¶ 15.  In her appeal, Doe requested Dean Nestler to overturn the Promotions Committee's decision; allow her to progress with her cohort to Phase 2 starting on February 17, 2026; and to "correct[ ] . . . probation

from [her] record." ECF No. 15-9 at 5. Doe argued that her "Cardiology remediation assessment cannot be considered valid" because "ADA accommodations with precedent were denied within this process without a full interactive process," and so she "was not given a fair remediation process that accommodates for [her] disability process." *Id.*

On February 22, 2026, Dean Nestler emailed Doe asking her if she was open to meeting again to discuss her latest appeal. ECF No. 15-12 at 2. The next day, Doe replied stating that "[her] requests remain." *Id.* at 1.

On February 26, 2026, Dean Nestler sent Doe a letter with his decision. Arden Decl., ¶ 19. In that letter, Dean Nestler explained that Doe's appeal focused on whether appropriate disability-related accommodations were provided in connection with her Cardiology remediation plan. Nestler Ltr. at 2. Observing that Doe had not previously requested additional accommodations with respect to the Cardiology remediation plan, he denied Doe's appeal because "accommodation requests cannot be made retroactively, after exams are administered." *Id.* Dean Nestler also noted that the denial of Doe's appeal was independently justified because her requests concerning the Cardiology remediation plan did not align with ISMMS's policies. *Id.*

## LEGAL STANDARD

Injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007) (emphasis

10

omitted) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). Plaintiffs seeking a preliminary injunction must show that "(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest." *New York v. U.S. Dep't of Educ.*, 477 F. Supp. 3d 279, 293 (S.D.N.Y. 2020) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

Furthermore, different legal standards apply when issuing a preliminary injunction depending upon whether it is prohibitory or mandatory. "Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018) (citing *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995)). "Because mandatory injunctions disrupt the status quo, a party seeking one must meet a heightened legal standard by showing 'a clear or substantial likelihood of success on the merits.'" *Id.* at 37 (quoting *N.Y. C.L. Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012)). Moreover, mandatory injunctions also demand a heightened legal standard concerning irreparable harm such that a "party must make a 'strong showing' that [it] will be irreparably harmed." *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 358 (2d Cir. 2024) (citation omitted).

Here, Doe seeks a mandatory injunction because she seeks to alter the status quo by asking the Court to direct ISMMS to end her administrative leave of absence

11

and immediately place her in clinical rotations with certain accommodations. Accordingly, Doe must meet a heightened legal standard by showing a clear or substantial likelihood of success on the merits as well as making a strong showing that, absent the injunction, Doe will be irreparably harmed.

## DISCUSSION

Doe pursues a preliminary injunction based on ISMMS allegedly violating Title III of the ADA, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. *See* ECF No. 12 ("Mem.") at 5-8. The Court holds that Doe has not shown a likelihood of success on the merits regarding any of her claims under the standard that applies to either prohibitory or mandatory injunctions. Accordingly, her motion for a preliminary injunction is denied.

"[T]he ADA provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 186 (2d Cir. 2015) (quoting 42 U.S.C. § 12132). Similarly, "Section 504 of the Rehabilitation Act provides . . . that '[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity.'" *Id.* (quoting 29 U.S.C. § 794(a)).

Since "the standards for actions under these provisions of the ADA and the

12

Rehabilitation Act are generally equivalent," *id.* at 187, the Court analyzes Doe's claims together.  To establish a violation under Title III or Section 504, Doe must demonstrate:

> (1) that she is a 'qualified individual' with a disability;
>
> (2) that the defendants are subject to one of the Acts; and
>
> (3) that she was 'denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of her disability.'

*Id.* at 187 (citation omitted).  The parties' dispute focuses on the third element.

Ultimately, "[b]oth acts prohibit discrimination against qualified disabled individuals by requiring that they receive reasonable accommodations that permit them to have access to and take a meaningful part in public accommodations." *Id.* at 186 (cleaned up).  In this vein, "[t]he ADA defines 'discriminate' as, inter alia, 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the provider of the service] can demonstrate that the accommodation would impose an undue hardship on' its operations." *Id.* (quoting 42 U.S.C. § 12112(b)(5)(A)).  Separately, under the Rehabilitation Act, "an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers.  To assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made." *Id.* (cleaned up).  "In the education context, the ADA and the Rehabilitation Act require a covered institution to offer reasonable accommodations for a student's known disability unless the

accommodation would impose an 'undue hardship' on the operation of its program, or 'fundamentally alter the nature of the service, program, or activity.'" *Id.* at 186-87 (cleaned up). "The hallmark of a reasonable accommodation is effectiveness." *Id.* at 189. While an educational institution must provide an "effective" accommodation, it need not provide a student with the "perfect" accommodation or the accommodation of their choice. *Id.* at 189 (citation omitted).

Doe's Title III and Section 504 arguments fail because she has not shown that she was denied the opportunity to participate in or benefit from ISMMS's MD program by reason of her disability. To the extent that Doe seeks as an accommodation to be permitted to proceed to Phase II without passing her Cardiology module, the Second Circuit has previously held that such a modification to a medical school program would fundamentally alter the program:

> It was well within [a medical school's] authority to decide that in order for it to adhere to the demanding standards of a medical school responsible for producing competent physicians, it needed to require plaintiff to pass Step I. The accommodation requested by plaintiff, that she be allowed to continue in the program without first passing Step I, would have changed the nature and substance of [the medical school's] program. Other underperforming students were required to prove their mastery of this knowledge before being allowed to advance. Permitting a student who did not definitively prove her mastery of basic medical sciences to advance into the later stages of medical school, and become a treating physician who had direct contact with patients was something the medical school correctly believed would unreasonably alter the nature of its program. When reviewing the substance of a genuinely academic decision, courts should accord the faculty's professional judgment great deference.

*Powell v. Nat'l Bd. of Med. Examiners*, 364 F.3d 79, 88 (2d Cir. 2004), *opinion*

14

*corrected*, 511 F.3d 238 (2d Cir. 2004).

Doe's request to be "immediately place[d] . . . in her clinical rotations" exceeds the bounds of equal access by requesting the circumvention of ISMMS's baseline policy requiring completion of all Phase 1 modules before advancement to Phase 2 clinical training.  Mem. at 11.  Doe's Title III and Section 504 arguments thus fail.

Doe relies upon the denial of her accommodation request with respect to the Hematology module as the potential ADA and Section 504 violation.  *Id.* at 7.  Yet Doe ultimately passed the Hematology module during the allotted remediation period.  She has been prevented from advancing to Phase II only because she has failed to achieve a passing grade in Cardiology.  *Id.* at 7-8.  Any denial of accommodation with respect to Hematology is irrelevant to the request for injunctive relief sought here.

Doe is unable to point to a reasonable accommodation with respect to her Cardiology module that she was denied.  Doe was generally provided with several disability-related accommodations at ISMMS, including additional time on exams, a distraction-reduced test environment, assessment rescheduling, and assignment extensions.  Nestler Ltr. at 2; Low Decl., ¶¶ 8, 10-11, 13, 15.  Regarding the Cardiology module specifically, Doe was provided additional support, including "guidance from a learning specialist, peer tutoring[,] and meetings with [her] module instructor."  Nestler Ltr. at 3.

Doe states that she was denied "structured, targeted support consistent with documented disability-related needs."  Mem. at 9.  Doe contrasts the academic

support she was given in connection with her Renal remediation with the support she received during her Cardiology remediation.  During her Renal remediation, Doe was provided with "targeted feedback identifying knowledge deficits, faculty meetings before and after assessments, and narrowly tailored evaluation of defined gaps," whereas her "Cardiology remediation consisted of an overbroad topic list, limited faculty interaction, and no targeted feedback."  *Id.* at 7.

The fact that a school previously provided a particular accommodation can constitute evidence of reasonableness, but a school is not obligated to "continue to grant that accommodation in the future, nor does it render the accommodation reasonable as a matter of law."  *Wong v. Regents of Univ. of California*, 192 F.3d 807, 820 (9th Cir. 1999) (citation omitted).  Rather, whether an accommodation is reasonable will be a fact-specific inquiry.  *Dean*, 804 F.3d at 189.

Doe is unlikely to prevail on her argument that ISMMS violated Section 504 and the ADA by refusing to provide her structured support with respect to the Cardiology module.  ISMMS made the academic judgment that targeted support was academically appropriate to remediate the Renal module because Doe had limited and specific deficiencies that needed to be cured in order to pass that module.  Nestler Ltr. at 2.  Doe initially received a 63% in her Renal module, had passed the end-of-module examination, and had passed one of her three quizzes in that module.  *Id.*; Fallar Decl., ¶¶ 7, 12.

In contrast, Plaintiff's deficiencies in Cardiology were global and comprehensive.  She had failed all four of her quizzes and she had an end-of-module

16

examination score of 38%. Nestler Ltr. at 2-3. ISMMS reasonably concluded that it was not academically feasible to target specific knowledge deficits or narrowly tailor her evaluation to defined gaps, where her knowledge gaps were so pervasive.

Furthermore, Doe did not request any additional accommodations concerning Cardiology until she had already failed the Cardiology remediation. *Id.* at 2. At that point, however, ISMMS determined there was insufficient time for Doe to remediate Cardiology before Phase 2 clinical training began. *Id.* at 3. Accordingly, Doe has not demonstrated that the accommodations she sought in her appeal of the February 12, 2026 decision amounted to accommodations that would enable her to participate in ISMMS's MD program on equal footing with other students.

Doe argues that, prior to February 12, 2026, she did submit a specific accommodation request regarding the Cardiology module. ECF No. 23 at 4. According to Doe, she "explicitly requested" that the structures support she received with respect to Hematology should apply to Cardiology during her meeting with the Office of Curricular Affairs ("OCA") on December 1, 2025. *Id.* Doe substantiates her claim by submitting a two-hour-long audio recording of that meeting for the Court's review.

Yet ISMMS policy requires disability accommodation requests to be submitted through a written application to DS, not raised verbally raised at a meeting with OCA. Low Decl., ¶ 4. Doe was well aware of this requirement as she submitted disability accommodation requests through this standard procedure no less than five times. *See* Low Decl., ¶¶ 7, 10-13, 15. Moreover, Doe's purported

17

accommodation "request" consists of comments made in passing over just 20 seconds during a two-hour-long meeting.  In response to one faculty member's explanation for why her remediation is targeted for the Renal module but needs to be global for the Hematology and Cardiology modules, Doe says:

> I haven't talked about Cardio because I actually wasn't given a plan for Cardio also, so I didn't even like get to that, and honestly, excuse me, my intent was not to discuss Cardio, my intent was basically to come to a conclusion of how remediation should look like and then just apply that to Cardio since nothing has been done for Cardio anyway.

Pl.'s Audio Ex. at 01:34:28-01:34:48.  Such brief, off-handed comments cannot reasonably be understood as a request for accommodations due to disability.

Even Doe's own written communications show that she did not think her comments constituted a disability accommodation request.  In an email sent to the Chair of the Promotions Committee on December 15, 2025, Doe writes:

> Earlier this morning, Disability Services notified me that they had received communication indicating that I had submitted *accommodation requests* to the Office for Curricular Affairs.  I would like to clarify that I did not submit any new accommodation requests to OCA, nor did I authorize OCA to engage Disability Services on my behalf.
>
> My recent correspondence concerned whether the proposed remediation plan could be revised in a way that better aligns with my learning needs, given my documented disability.  This was a curricular inquiry, not a request for additional disability accommodations.  Unfortunately, it appears this distinction may have been misunderstood, and disability-related information was discussed without my knowledge or involvement.

18

> Given the significance of this misunderstanding, I respectfully request that the committee base its deliberations on an accurate account of my actions and intentions:
>
> - I did not request any modification to my official accommodations.
>
> - My inquiry was limited to whether the remediation plan's structure could be adjusted to support my learning needs within the established curriculum.
>
> - I remain fully committed to completing remediation successfully and in accordance with institutional expectations.

ECF No. 15-1 at 2-3 (emphasis in original). Further, in Doe's December 23, 2025 email to Dean Nestler appealing the Promotions Committee's Academic Probation decision, she noted, in reference to her December 1, 2025 meeting with OCA, "concerns related to psychological safety, including . . . Contacting Disability Services without my consent, inaccurately framing internal discussions as accommodation requests." ECF No. 15-3 at 7. That Doe now argues that her comments at the December 1, 2025 meeting constituted a formal disability accommodation request—when she previously explicitly disavowed such framing on multiple occasions—reeks of bad faith.

Accordingly, Doe has failed to carry her burden of establishing a likelihood of success on her ADA or Section 504 claims.

19

## CONCLUSION

Accordingly, Doe's motion for a preliminary injunction is **DENIED**. The

Clerk of Court is directed to terminate ECF No. 7.

    SO ORDERED.

Dated:  June 18, 2026
      New York, New York

                                    JEANNETTE A. VARGAS
                                  United States District Judge

20